# W. Lowry Mann, III, et al.

## v.

# Addicott Hills Corporation

Record No. 880603

September 22, 1989

Present: All the Justices

*John H. Rust, Jr. (Glenn H. Silver; Donna H. Henry; Jose Aunon; Rust, Rust & Silver*, on briefs), for appellants.
*John Edwards Harrison (Sandra L. Hughes; Light & Harrison, P.C.*, on brief), for appellee.

Justice Compton delivered the opinion of the Court.

In this real property controversy, purchasers appeal from a decree denying their request for specific performance of a contract for the sale of a newly constructed home. The controlling question is whether a "sale of existing residence" contingency to the sales contract was for the sole benefit of the purchasers so that breach of the contingency did not permit the seller to terminate the contract.

On March 1, 1986, the contract in question was executed by appellants W. Lowry Mann, III, and Barbara C. Mann, his wife, and appellee Addicott Hills Corporation. The Manns agreed to buy from Addicott Hills Lot 11 improved with a dwelling known as 9105 Peartree Landing in Union Farm Subdivision located in Fairfax County. The purchase price was $296,580 payable: $5,000 upon execution of the contract; $100,000 "representing the proceeds of a loan to be made to Purchaser by the mortgage lender"; and $191,580 at settlement.

Subsequently, the seller terminated the contract and the purchasers filed the present suit seeking specific performance of the agreement. Following an ore tenus hearing, and after briefing by counsel, the chancellor denied the request for specific performance in a letter opinion. We awarded the purchasers this appeal from the February 1988 final decree dismissing the suit. Cross-error assigned by the seller was refused at the petition stage of the appeal.

The facts mainly are undisputed. Where they are in conflict, however, we will recite them in the light most favorable to the seller, who prevailed below, in accordance with settled appellate principles.

The March 1988 contract included three separate pre-printed documents supplied by the seller: a "New Home Sales Agreement," a "Sale of Existing Residence Addendum" (the contingency), and a "Delivery and Payment of Non-Standard Options Addendum."

Relevant to this dispute, the contract provided that the seller would complete construction of the dwelling "on or before November [1986]," but that the completion date could be extended if delays beyond the control of the seller occurred; that if the contract was not performed by the purchasers according to its terms and conditions, then it could be terminated by the seller; and, that time was of the essence in the performance of the purchasers' obligations. The agreement also recited acknowledgement by the purchasers that the "projected delivery date" was only an estimate and "cannot be guaranteed by the Seller or its agent."

The focus of the controversy is the contingency, included at the purchasers' request. It provided that within 90 days from the date "house framing starts," the purchasers "shall deliver to Seller a copy of a written contract" between the purchasers and a third party for the sale and purchase of the purchasers' "present residence." The contingency further specified that the purchasers "shall: (a) Immediately commence to use diligent and good faith efforts to sell" the purchasers' existing residence; "(b) Immediately list" the purchasers' residence with a reputable realtor in the vicinity of the purchasers' Alexandria home and that the purchasers "shall produce satisfactory evidence of such listing to Seller within fifteen (15) days, after the start of house framing"; and "(c) Make diligent, good faith and prompt efforts to enter into a contract for the sale of" the purchasers' residence.

The contingency also provided that if the purchasers without fault failed to secure a written contract within the 90-day period for the sale of their residence, the purchasers could terminate the contract within the period upon written notice to the seller accompanied by the purchasers' listing contract and an affidavit of the listing broker that the purchasers' "efforts" were unsuccessful. Finally, the contingency provided that if the purchasers failed to secure a written contract for the sale of their residence, by reason of the purchasers' "acts or failure to act," or if the purchasers failed to deliver "a copy of the sales contract so obtained or a copy of the listing contract to Seller within the time period above specified," the purchasers "shall be deemed in default of this Contract, and the provisions of contract shall govern."

Among the documents completed by the purchasers for the seller in connection with the transaction were a "Confidential Customer Information Sheet" and a "Market Profile." On the former, the purchasers indicated the equity in their Alexandria residence was to be a source of funds for the down payment and settlement charges for their purchase. They represented the truth of that information for the purpose of establishing their "reported ability to consummate this transaction." On the latter form, the purchasers indicated that they owned a home which was not listed for sale and that they "must sell."

At the time of contracting, the purchasers were advised by Sandra Lindsay, an officer of Addicott Hills, that Fairfax County had not "approved Union Farms subdivision." According to a stipulation, the "plat of subdivision was approved in August [1986] and recorded."

Framing of the subject home was "under way" on November 13, 1986. At the end of August and in early September, Daurie Schwab, the seller's sales agent, began asking the purchasers to list their residence for sale. These contacts were mainly with Mrs. Mann, who was a real estate agent with ten years' experience. In November, Schwab notified Mrs. Mann that framing had started and that "it was time for her to put her house on the market." Mrs. Mann refused this request, contending the seller was unable to furnish a delivery date for the new home at that time. The purchasers were concerned their existing residence would be sold before the new home was ready for occupancy and that they would be "out on the street without a house to move to."

Schwab contacted Mrs. Mann repeatedly in December and January about listing the purchasers' home, advising her on January 9 that "it is definitely time to put the house on the market." Mrs. Mann "refused to comply and said that the builder is not meeting his production schedule."

On January 13, 1987, Lindsay wrote the purchasers and advised that no copy of the listing on their present home had been received. The letter stated: "In order to avoid termination of the Sales Agreement, please provide this office with a copy of your listing within five days of receipt of this letter." In a conversation between Mrs. Mann and Lindsay following the Manns' receipt of the letter on January 17, Lindsay offered to have the settlements on the houses coincide "to address her concerns about the moving." Lindsay previously "had given Mrs. Mann a June completion date" for the new home.

Following the conversation, Mrs. Mann responded in writing on January 21 to Lindsay's letter. She stated that "it looks like a quite accurate estimate of occupancy on the various lots at Union Farm should be able to be made early in March." She wrote that she was enclosing a listing for her home effective March 1, 1987, noting she hoped to sell her home to enable the move to the new dwelling "to be house-to-house."

In a letter dated January 30, 1987, received by the purchasers on February 2, Carl Bernstein, the seller's president, stated that the "failure to timely list your present home for sale," as required by the agreement, had resulted in a breach of contract. Bernstein stated that the purchasers' decision to list their home "as of March 1 is totally unacceptable. Consequently, the sales agreement is herewith terminated." During the afternoon of January 30, after the letter was written, the property was "released" by the seller to be "re-listed for sale."

On February 4, 1987, the purchasers executed and sent to the seller a document labelled "Waiver," which stated: "The undersigned hereby waive the right to have the validity of the contract dated March 1, 1986, contingent upon the sale of their house. This contingency is hereby removed." The purchasers sent with the waiver another listing for the sale of their home effective February 2.

On February 11, 1987, new purchasers executed a contract to buy the subject property from the seller for $362,500. This suit was filed in April 1987. The home on the subject property was

completed by the seller in September 1987. At the time of trial, the Manns had not sold their home.

The trial court decided that the seller's termination of the contract was proper because the purchasers failed to comply with the terms of the listing requirement in the contingency. Rejecting the purchasers' contention that the contingency was for their sole benefit, giving them the option of cancelling the contract should their home not sell or of waiving the contingency and proceeding to settlement, the trial court held there was "insufficient evidence" to indicate that the contingency was for the purchasers' benefit only. The chancellor found that the contingency gave the seller "a measure of assurance" that the purchasers would perform and that it was "not totally one sided; the Seller derives some benefit from it as well." Holding the purchasers' breaches of the contingency to be material, the trial court ruled that they were not entitled to specific performance of the sales contract.

On appeal, the purchasers note the rule that a purchaser's breach of a condition inserted in a contract for the purchaser's sole benefit may be waived unilaterally by that party, without affecting the other party's obligation to perform. *See Reid* v. *Field*, 83 Va. 26, 32-33, 1 S.E. 395, 399-400 (1887). The purchasers contend that the trial court erred in holding that the contingency was not for their sole benefit. They argue that whether a purchaser sells his existing residence "is of absolutely no consequence" to a seller "if" the purchaser otherwise is prepared to close. This is an allusion to evidence that, due to a "dramatic" improvement in their financial condition which developed nine months after the contract was executed, the purchasers were able to close the transaction without needing any of the funds from the sale of their existing residence. They argue that the "purpose of an existing home sales contingency is to protect a purchaser against the risk and expense of owning two homes if he is unable to sell his old home prior to closing on the new home." Thus, they contend, any alleged breach of the contingency permitted the seller to treat the contingency as waived and to demand that they proceed to settlement, but did not permit the seller to terminate the contract. They say that full settlement on the sales contract was all that the seller could require of them, and would have satisfied the only reasonable expectation which the seller had under the contract. We do not agree.

■ Under the facts and circumstances of this case, the trial court properly construed the contract by interpreting the contingency as a condition for the benefit of the seller, as well as the purchasers. The evidence was uncontradicted that the listing of the purchasers' home was "critical" to Addicott Hills at the time of contracting. According to the testimony, the seller had "a loan from a lender on this subdivision." The terms of the construction loan required that the seller complete a certain number of sales in the subdivision to qualify for periodic payment by the lender of the construction funds. Therefore, a contract for sale which, as here, contained a condition giving the purchasers an absolute right to cancel the agreement if their home was not promptly sold necessitated provisions for the seller's protection that the transaction be closed expeditiously and with certainty. The contingency furnished that protection.

Moreover, information supplied to the seller indicated that the Manns "had to sell their house to use the equity from that sale to qualify for a loan to proceed to settlement." At the time, the seller "did not have a loan approval" for the purchasers. And, the purchasers never advised the seller, prior to termination, of their newly acquired financial independence.

Consequently, we agree with the trial court that the contingency requirement that the purchasers immediately list their current residence and produce evidence of the listing within 15 days of house framing gave the seller assurance that the purchasers would be able to perform, a circumstance of vital interest to Addicott Hills, and was not for the purchasers' benefit only.

■ Finally, and notwithstanding their breach, the purchasers contend that the chancellor erred in refusing to require the seller to specifically perform the contract. We reject that contention. In spite of explicit language in the contingency tying the purchasers' obligations to the start of "house framing," a provision inserted in the form document at the purchasers' request, the purchasers refused to act. House framing was in progress on November 13 and, disregarding repeated requests by the seller that the purchasers perform, they waited for over two months to make any effort to list their home for sale. This was a blatant violation of material (not *de minimis*, as the purchasers argue) terms of the agreement which gave the seller, according to the contract, the right to terminate. The breach is more egregious because the purchasers, one of whom was an experienced real estate agent, could have ar-

ranged for the settlements on the old and new homes to coincide and thus could have avoided any concern about being "on the street" before the new home was completed. Therefore, we cannot say that the result is harsh and inappropriate as the purchasers contend, or that the chancellor abused his discretion in denying specific performance. *See Grubb* v. *Moore*, 108 Va. 72, 60 S.E. 757 (1908).

For these reasons, the decree below in favor of the seller will be

*Affirmed.*